### R. J. PASS ET AL. *v.* N. E. MORTGAGE SECURITY CO.

1. USURY.  *Cost of negotiating loan.  Pay of intermediary.*
    A loan at the highest legal rate of interest is not rendered usurious by the fact that the borrower pays another than the lender a certain sum for negotiating the loan.

2. SAME.  *Interest.  Cost of negotiating loan, not interest.*
    Interest is the price paid for the use of money.  If a sum be paid by the borrower to another for the means of obtaining a loan, this is not interest, and it is not to be estimated in determining whether the rate be usurious.

3. COST TO BORROWER.  *Lender's knowledge thereof.  Loan not affected thereby.*
    The fact that the lender has knowledge that the borrower is paying a certain sum, even though it be exorbitant, to a third person for procuring the loan, does not render the transaction usurious, if the lender receives no more than the legal rate of interest for the use of his money.

4. USURY. *Expense of obtaining loan.  Case in judgment.*
   P agreed to pay A six hundred dollars to procure for him a loan of three
   thousand dollars, for five years, at eight per cent. per annum, upon the
   security of his farm, and an additional twenty-five dollars for the necessary
   abstract of title.   A forwarded the application and abstract to O, the
   agent of the Corbin Banking Co., who forwarded them to said company.
   The latter referred them to the N. E. M. S. Co., which consented to lend
   three thousand dollars upon the security.   Thereupon the C. B. Co. pro-
   cured the execution of the note and trust-deed by P, payable to N. E. M.
   S. Co., and advanced the three thousand dollars, which was paid, less the
   commission, six hundred dollars, to P.   The six hundred dollars was
   shared between the C. B. Co., O, and A.   The N. E. M. S. Co. received
   none of the commission, but upon receipt of the note and trust-deed, paid
   the three thousand dollars to the C. B. Co.   *Held*, in a suit between the N·
   E. M. S. Co. and P, that there was no usury in the transaction.

5. PRINCIPAL AND AGENT. *Creation of agency.*
   Mere frequency of transactions of the same sort between independent parties
   does not create the relation of principal and agent.

FROM the chancery court of Grenada county.

HON. J. G. HALL, Chancellor.

The appellants filed their bill in the chancery court to set aside
a sale of land made by the trustee in a deed of trust, alleging,
among other reasons for avoiding the sale, that the loan which
the trust-deed was given to secure was usurious.   Whether the
contract was usurious is the only controversy presented in this
court.   The facts in reference to the loan were as follows :

The Corbin Banking Company, of New York, was, in 1882,
engaged in the business of negotiating loans of money for persons
or corporations having money for investment, the loans to be se-
cured by trust-deeds upon improved farms.   In this capacity it
frequently effected loans for the New England Mortgage Security
Company.   For the purpose of extending its business and facili-
tating loans the Corbin Banking Co. employed agents, and located
them at various places throughout the United States.   Among
these agents was one Ocoboc, who established and kept his office
in Memphis, Tenn.

Printed forms for applications and other agreements pertaining
to such loans were furnished to Ocoboc by the Corbin Banking

Co., and were in turn furnished by Ocoboc to local agents or correspondents in the counties where loans were likely to be made. Among the latter was B. C. Adams, an attorney, who lived at Grenada, Miss. The arrangement between the foregoing parties was this: applications were made in the first instance to Adams, who filled out the printed forms for applications and prepared an abstract of the land offered as security. In addition, printed agreements were signed by the borrowers constituting Adams the agent or attorney of the borrower, and agreeing to pay Adams twenty per cent. of the amount borrowed as commission. Of this commission, Adams was to receive two per cent., and Ocoboc and the Corbin Banking Co. shared the remainder. The agreement between Ocoboc and the Corbin Banking Co. was that the former should receive all the commissions on loans passing through his office, provided his earnings should not thus exceed five hundred dollars per month, in which event the excess should all belong to the company.

Public notice by advertisement was made by Adams, in Grenada county, to the effect that he was prepared to negotiate loans upon reasonable terms; and in November, 1882, the appellants applied to Adams for a loan of three thousand dollars, offering to give a trust-deed upon certain land in said county as security. The land was valued by an appraiser appointed by Adams, and the security approved. An abstract of title was then prepared and forwarded with the application and appraisement to Ocoboc, who, in turn, sent them to the Corbin Banking Co. Upon receipt of the papers the Corbin Banking Co. sent the application to the New England Mortgage Security Co., of Boston, Mass., which received it on December 19, 1882, and notified the Corbin Banking Co. that " upon receipt of the abstract of title, if the papers were satisfactory, the money would be paid." The latter company thereupon prepared a note for three thousand dollars, dated Grenada, Miss., December 23, 1882, payable to the New England Mortgage Security Co., at the office of the Corbin Banking Co., five years after date. Five coupons, representing the interest at eight per cent., were attached, maturing annually on December 1. This, with the trust-deed and a check by the Corbin Banking Co. on itself for three thousand dollars in favor of

Ocoboc, was sent to the latter.  The note and trust-deed was then forwarded by Ocoboc to Adams, at Grenada, together with his individual check for two thousand four hundred dollars, payable to the order of appellants.  The note and trust-deed were then executed by appellants and delivered to Adams, who gave them the check for two thousand four hundred dollars.  This was the amount of money received by the said borrowers, and out of this they paid Adams twenty-five dollars for the abstract of title.  The trust-deed, after being recorded by the chancery clerk, was returned with the note and abstract to Ocoboc, and the note and trust-deed were sent by him to the Corbin Banking Co., and by that company sent to the New England Mortgage Security Co., which on January 13, 1883, remitted three thousand dollars to the Corbin Banking Co.  Out of the amount of commission charged, viz.: six hundred dollars, Adams received sixty dollars, Ocoboc eighty-four dollars and thirty cents, and the Corbin Banking Co. four hundred and fifty-five dollars and seventy cents.

The proof shows that the New England Mortgage Security Co. had frequent dealings of this character with the Corbin Banking Co., and had been thus taking loans negotiated by that company for many years.  The former company, as the evidence shows, had confidence in the business management of the Corbin Banking Co., and was willing to loan on securities approved and recommended by it.  It is also shown that the president of the latter company was a director in the New England Company.

The appellant, Algernon Pass, testifies that he never knew the Corbin Banking Co. in the transaction, but the receipt given for the proceeds of the loan is as follows:

January 1, 1883.

Received from the Corbin Banking Company three thousand dollars, proceeds of loan negotiated by them for me with the N. E. M. S. Co., less commissions as agreed.

REBECCA J. PASS,
ALGERNON PASS.

When the money was paid to the borrowers a deed of trust,

already existing, upon the land, was paid off out of the proceeds of this loan, and the cancellation thereof noted on the abstract of title.

The officers of the New England Company swear that the Corbin Banking Co. was not its agent to make loans, but that it, the N. E. M. S. Co., had accepted many applications from the Corbin Co., and placed a great many loans for it; that the N. E. M. S. Co. relied upon the knowledge that the Corbin Co. would not negotiate any loan without careful investigation. The New England Company received no part of the six hundred dollars commission, and its officers swear that they knew nothing of the arrangement for compensation in favor of the Corbin Banking Co., Ocoboc, or Adams. Adams and Ocoboc testify that they knew nothing of the source from which the money would be obtained until they got the notes and trust-deed, and saw how they were payable.

The chancellor, upon final hearing, held that the transaction was not usurious, but set aside the sale for other reasons, and ordered a resale to pay the amount due upon the trust-deed in favor of appellee.

*Wm. C. McLean,* for appellants.

1. I maintain that the C. B. Co. was either the original lender of the money, or was the agent of the N. E. M. S. Co. There is no evidence whatever that the C. B. Co. was the agent of the borrower.

Long before the appellee ever saw the notes, the trust-deed, or abstract of title, the borrowers had received the money; long before the appellee had determined to pay the three thousand dollars, or advance this money, Pass had executed the note and trust-deed, and received the money. Now, whose money? That of the N. E. M. S. Co.? No. It had advanced no money, and had none in the hands of the C. B. Co. There is no evidence to show that the latter had any authority to advance any money for the N. E. M. S. Co. Quite the reverse, for the president of the New England Company swears that he did not know that the C. B. Co. had advanced the money.

The C. B. Co. had loaned other amounts aggregating, with this loan, eighteen thousand three hundred and fifty dollars for the

66 MISS.—24

appellee, and these were all settled for by a check payable to the C. B. Co. on January 13, 1883. If the loans were made, and the money advanced in good faith, why did not the C. B. Co. charge interest on the amounts advanced for the time between January 1 and January 13? Such advances, without charging interest, are contrary to business principles, and the every-day transactions of business men, and the established rules and customs of trade. Again, the C. B. Co. says it passed upon and *accepted* the loan. Accepted for whom? If it was the agent of Pass it could not, of course, accept it. Pass could not accept an application presented by himself. If so, his agents could not. Else we would have one doing by an agent what he could not do by himself. Therefore the C. B. Co. either paid its own money to Pass and was thus the principal, or else accepted the loan as agent of the lender. *Reed* v. *Smith,* 9 Cowen (N. Y.) 647.

Suppose that when the note and trust-deed with the abstract were submitted to the N. E. M. S. Co., on January 13, it had refused to advance the money on it, upon the ground that the papers were not satisfactory, who would then be the lender of the money? The C. B. Co., of course. Whether the papers were satisfactory or unsatisfactory to the N. E. M. S. Co. could not alter the question who was the lender of the money now being used by Pass. The contract was already executed. The borrowing and lending had taken place at the very time when Pass executed the papers and got the money.

If the N. E. M. S. Co. had refused to advance the amount, the C. B. Co. would have had no recourse upon it, because it had not authorized the transaction. The C. B. Co. could not say it acted as agent of the N. E. M. S. Co., because that would taint the transaction with usury. The courts would not lend their aid to enforcing a claim arising out of or connected with an illegal consideration. *Wooten* v. *Miller,* 7 S. & M. 380. The case is the same as if the note was payable to the C. B. Co. and by it transferred to the N. E. M. S. Co. It was a shift to evade the usury laws.

2. But concede that the C. B. Co. was not the lender of the money, it then necessarily follows that it was acting as the agent of

the lender.   No amount of disguise or concealment can obscure the fact that it was not acting as the agent of the borrower.   The entire arrangement as to terms, and the methods of doing business, was perfected between the C. B. Co., Ocoboc, and Adams.   The latter was acting under instructions of Ocoboc, who furnished all the blanks and necessary forms, and specially enjoined on him to require the borrower to sign an agreement constituting Adams the agent of the borrower, as a condition precedent to getting the loan.

Adams says he never knew the C. B. Co. or the N. E. M. S. Co. The N. E. M. S. Co. says it never knew Ocoboc or Adams, but the N. E. M. S. Co. knew the C. B. Co., and the C. B. Co. knew Ocoboc, and Ocoboc knew Adams.   A very cunningly devised scheme, but one which shows the loan to be infected with the leprosy of usury.

The relation of agency depends more upon the acts of parties than upon their express agreements.   This relation arises whenever one person expressly or by implication authorizes another to act for him, or subsequently ratifies the act of another in his behalf. *Sherwood* v. *Roundtree*, 32 Fed. Rep. 119.   Further, as to agency in cases like this, see *Matteson* v. *Blackmer*, 46 Mich. 396 ; *Cheney* v. *Woodruff*, 6 Neb. 154 ; *Wilcox* v. *R. R. Co.*, 24 Minn. 270 ; *Milligan* v. *Davis*, 49 Iowa 126.

I call especial attention to the cases of *N. E. M. S. Co.* v. *Gay*, 33 Fed. Rep. 636 ; *N. E. M. S. Co.* v. *Hendrickson*, 13 Neb. 157 ; *N. E. M. S. Co.* v. *Addison*, 15 Neb. 336, as decisive of the case at bar.   In three of the cases cited the N. E. M. S. Co. was a party, and a lender through the medium of the C. B. Co. as in this case.

After a careful examination of the authorities, I have not found a single reported case in which the C. B. Co. has been held the agent of the borrower.   (Counsel reviewed the facts at length to show that there was a well-established relation of agency between the N. E. M. S. Co. and the C. B. Co., and that the latter so engineered the loan for the N. E. M. S. Co. as to avoid the appearance of usury.)   The unreported case of *N. E. M. S. Co.* v. *Towns*, recently decided in this court, is no authority in this case, as the facts and circumstances relied on in that case are conspicuously absent in this.

3. The New England Company had notice of the usury in the contract, or such knowledge as was sufficient to affect it with notice. On the point of notice, see *Buck* v. *Paine*, 50 Miss. 655 ; Wade on Notice, § 77 ; 11 Wall. 356 ; *Pfenning* v. *Scholer*, 43 N. J. Eq. 15 ; *Demarest* v. *Vandenberg*, 41 Ib. 64 ; 40 Ib. 502.

4. But conceding that the N. E. M. S. Co. did not have any knowledge that the C. B. Co. was exacting usury, yet that makes no difference. That will not relieve the contract of the taint of usury. *N. E. M. S. Co.* v. *Hendrickson*, 13 Neb. 157 ; *Philo* v. *Butterfield*, 3 Neb. 256 ; *Cheny* v. *White*, 5 Neb. 261 ; s. c. 25 Am. Rep. 487 ; *Cheney* v. *Woodruff*, 6 Neb. 151 ; *Payne* v. *Newcomb*, 100 Ill. 611 ; Tyler on Usury 170 ; *Condit* v. *Baldwin*, 21 N. Y. 219 ; *Bell* v. *Day*, 32 N. Y. 165 ; 54 N. Y. 360.

If the commission or bonus charged is unreasonable, the loan is usurious. 35 Minn. 457. In this state it is well settled that usury can be pleaded against a *bona fide* purchaser for value. *Coulter* v. *Robertson*, 14 S. & M. 18 ; *Bond* v. *Jones*, 8 S. & M. 368 ; *Chaffe* v. *Wilson*, 59 Miss. 42 ; Code 1880, § 1141. If a *bona fide* purchaser is not protected, surely a principal will not be. *Rozelle* v. *Dickerson*, 63 Miss. 539.

The agency of the C. B. Co. was not special and limited to this particular loan, but extended through several years, and the transactions of this character have been so numerous that the officers of the lender cannot enumerate them. In *Austin* v. *Harrington*, 28 Vt. 130, the loan was held usurious, though made without the knowledge or consent of the principal. It is submitted that Adams, Ocoboc, and the C. B. Co. were all agents of the lender. If so, the rate of interest exceeded fifteen per cent. If Adams was the agent of the borrower, then the rate was over fourteen per cent. If the C. B. Co. was the agent of the lender, then the rate was thirteen per cent. per annum.

*W. C. McLean* also made an oral argument.

*Watson & Hirsh*, for appellee.

Upon the facts of this case, we think it clear that neither Adams nor the Corbin Banking Co. nor Ocoboc was the agent of the N. E. M. S. Co. There is nothing from which a remote suspicion of

such agency can arise, except as to the C. B. Co., and the relationship between it and the N. E. M. S. Co. was one of confidence rather than agency. There was no agreement between the two companies, and, in the absence of any agreement, the facts do not establish an agency.

If we are right in this, there can be no usury in the transaction. *Ballinger* v. *Bourland*, 87 Ill. 513, s. c. 29 Am. Rep.; *Philo* v. *Butterfield*, 3 Neb. 256; *Conover* v. *Van Mater*, 18 N. J. Eq. 481.

The contract *does show* that Adams was employed at a stipulated sum by Pass to negotiate the loan. The contract of employment was in writing. He was employed to negotiate for Pass a loan of three thousand dollars for five years at eight per cent. per annum, for which Pass was to pay him six hundred dollars. This service Adams says he performed for Pass, as his agent. Does the fact that Adams, before undertaking this service, had made arrangements with Ocoboc or the C. B. Co. to negotiate loans upon terms such as they would approve render Adams any the less the agent of Pass than if he had gone blindly into the business, and run across Ocoboc by chance? Adams became the agent of any one who would employ him upon such terms as would enable him to obtain Ocoboc's aid in the negotiation. It is therefore clear that he was the agent of Pass until the loan was procured.

Appellants' counsel admit that there is no direct evidence of the fact that the Corbin Co. was the agent of the N. E. M. S. Co. But suppose there was, how would this case then stand? Adams was unquestionably the agent of Pass; Pass unquestionably agreed to pay him six hundred dollars for negotiating the loan. Pass denies this, but the denial is in the face of his written agreement. Now, if Pass agreed to pay Adams for negotiating the loan, and Adams agreed to divide with Ocoboc and the Corbin Co., or either of them, as the agent of the N. E. M. S. Co., still this would not necessarily make the loan usurious. *Dickey* v. *Brown*, 55 Am. Dec. 396, n. (s. c. 56 Iowa 426).

Counsel for appellants would have the court to infer that the Corbin Co. was the agent for the N. E. M. S. Co., because the former advanced the money to Pass thirteen days before they received

it from the latter. But it also appears that before this advance was made the C. B. Co. had forwarded the application to the New England Company, which accepted the loan, and promised to pay the money if the papers were satisfactory. Thereupon the C. B. Co. closed the loan and advanced the money, charging it up to the N. E. M. S. Co., and thirteen days afterward it was paid back. This was not only natural but proper. It was for the accommodation of Pass, and was necessary to clear the title. As the N. E. M. S. Co. had accepted the loan, after inspecting the application and noting the security, the Corbin Co. could well assume, from their knowledge of what was required in such cases, that the papers " were satisfactory," and take the risk of advancing the money. The N. E. M. S. Co. derived no benefit from the advance, and was not aware, at the time it paid the three thousand dollars, that the advance had been made.

(Counsel here reviewed the evidence at length, arguing that the transaction was not usurious, but analogous with very many cases where advances were made by one for another upon mutual confidence, as in the cases of brokers. It is well settled that a broker has generally the power to use all the means necessary to effect the business for which he was employed. 2 Am. & Eng. Encyc. of Law 573).

It is undisputed that the C. B. Co. was engaged in the business of negotiating loans on mortgages, and it is overwhelmingly established that the Corbin Co. was employed by Adams, as the agent of Pass, to negotiate a loan of three thousand dollars for Pass, and the previous understanding between Adams and Ocoboc, who was the agent of the C. B. Co., can cut no figure in the case. We concede that the course of dealing between the C. B. Co. and the N. E. M. S. Co. shows that the latter placed great reliance upon the knowledge of the fact that the C. B. Co. would not undertake the negotiation of any loan without careful investigation, but this was a matter exclusively between these two companies, and did not concern Adams, Pass or Ocoboc.

It is proved beyond question that the N. E. M. S. Co. only demanded eight per cent. interest, and did not expect to share or, in

fact share, any additional commission or interest realized by Adams under the agreement.   The inference of agency is not alone enough for appellants' purpose.   The further inference must be drawn from the facts, in the face of positive testimony to the contrary, that the Corbin Co. 'was not only the agent of the N. E. M. S. Co., but that the latter knew and sanctioned the extravagant charge made by Adams pursuant to the agreement with Ocoboc.   Unless such knowledge is shown the defense of usury is not made out. This is well-settled law.   *Call* v. *Palmer*, 116 U. S. 98, and cases cited; *Ballinger* v. *Boyd*, 29 Am. Rep. 69, 70; *Davis* v. *Garr*, 55 Am. Dec. 396, 397, 398; *Merch* v. *The Am. F. L. M. Co.*, 79 Ga. 213; *N. E. M. S. Co.* v. *Towns*, MSS.   This last case, recently decided by this court, is in all material points identical with this case, and is decisive in favor of appellees.

*J. H. Watson* also argued the case orally.

*Perkins & Percy*, on the same side.

The C. B. Co. acted generally in the capacity of a loan broker, and, in reference to the subject-matter of this litigation, acted as such.   The same facts, if applied to a mercantile transaction, would make the C. B. Co. a merchandise broker, and having occurred with regard to a loan of money, they establish it as a loan broker.

Suppose the subject of the negotiation had been merchandise, and the C. B. Co. had been guilty of negligence, upon whom would the consequences be visited?   Of course, upon the principal of the C. B. Co.   But how are we to determine who was its principal? The books are unanimous in saying that, for all practical purposes, a broker is agent of the party who first employs him.   He is the agent of both parties only for a single purpose, viz.: that of executing the bought and sold notes which evidence the transaction and satisfy the statute of frauds; for all other purposes he represents exclusively the party who originally employed him.   *Schlesinger* v. *Ry. Co.*, 87 Mo. 146; Whart. Agency, § 715.

There is no inherent illegality about brokerage transactions, unless they involve necessarily the idea that all borrowers who obtain money through such instrumentality pay more for the use

of it than the highest conventional rate allowed. To say the money *costs* the borrower so much, and to say that he pays so much for the use of it, are two very different things. The authorities are uniform in holding that the expenses of securing a loan at the highest rate of interest are not to be counted as money paid *for the use* of money. Such payment for services either in procuring and negotiating the loan, or preparing · papers or abstracts of title, certainly add to the expense and cost of the loan, but in the same way that recording fees do. That the loan-brokerage business is a lawful one was settled by this court in the recent case of *Townes* v. *N. E. M. S. Co.,* 1 So. Rep. 242.

Appellants virtually say that all money paid by the broker, over and above what his services are reasonably worth, must by a fiction of law for the benefit of the borrower, and to enable him to plead usury, be transferred to the lender, and charged to him, whether he was knowing to it or not, and whether he received any of it or not. " It can hardly be contended that the penalties imposed for a violation of the usury law are intended as a reward for the borrower." *Call* v. *Palmer*, 116 U. S. 103.

*Calvin Perkins,* of counsel for appellee, made an oral argument.

CAMPBELL, J., delivered the opinion of the court.

The lender in this case, the N. E. Mortgage Security Co., did not take or stipulate for a greater rate of interest for the use of its money than the law allows, and therefore its contract was not usurious. It matters not, if intermediaries, through whom the borrower effected the loan, charged for their services a sum which added to the interest stipulated made the cost of the use of the money to exceed the legal rate of interest. If the borrower has to pay others than the lender for the means of obtaining the loan, that is not usury, for it is not the price of the use of the money, but the cost of getting it at all. If I agree to pay a man a thousand dollars to secure for me from another a loan of five thousand dollars at a legal rate of interest, and he obtains it by his credit or influence or labor, it matters not by what means, I cannot maintain the defence of usury against the evidence of debt executed by

me to the person who was induced to part with six thousand dollars as a loan to me, if that person neither stipulates for nor receives for his loan more than the legal rate of interest. Nor does it make any difference that he has full knowledge that the cost to me of securing the loan is so great as that supposed. I may be willing to lend money on the guaranty of an individual. If one desiring to borrow pays that individual even an exorbitant price for his guaranty, and thereby gets my money at a rate of interest to be received by me within the bounds of the statute, there is no usury. I may be willing to lend money on the faith of the representation of another that he thinks the transaction a safe one, and if he charges a borrower for the service rendered him in recommending to me the loan, that is their matter and in no manner affects my loan, if I am not to get more than the law allows for the use of money. The application of these principles to the facts of this case presents the loan as without any semblance of usury.

The N. E. M. S. Co. had money to lend on mortgages of real estate at eight per cent. interest, if satisfied as to the security. The Corbin Banking Co. was engaged in the business of negotiating loans of this kind, and was in the habit of effecting them with the N. E. M. S. Co., which had confidence in its business methods and representations, and was willing to lend on transactions it favored. The Corbin Banking Co. found the business of effecting loans profitable, and sought to extend it by agents at different points to whom it furnished printed blanks for making applications for loans according to its methods, and in this case it advanced money to pay off an incumbrance on the land, and thus make it an acceptable security on which the N. E. M. S. Co. would lend the money, and this consummation enabled the Corbin Banking Co. to earn the compensation it had bargained for, if the loan was effected.

The fact that the N. E. M. S. Co. was in the habit of lending money on securities presented and recommended by the Corbin Banking Co. did not create the relation of principal and agent between them. Mere frequency of transactions between inde-

pendent parties does not create one the agent of the other. One may get beef at a butcher's every day in the year for a score of years without establishing any relation of principal and agent between them.

This case presents, only somewhat more distinctly, the same features as *N. E. M. S. Co.* v. *Townes,* MS. (Southern Rep. vol. 1, No. 6, p. 242), in which we held the transaction free from usury.

*Affirmed.*